Not Intended for Print Publication

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Case No. 1:04CR00050 |
| ) | |
| v. ) | **OPINION AND ORDER** |
| ) | |
| LARRY A. CLYBURN, ) | By: James P. Jones |
| ) | Chief United States District Judge |
| Defendant. ) | |

*R. Lucas Hobbs, Assistant United States Attorney, Abingdon, Virginia, for United States; Michael A. Bragg, Abingdon, Virginia, for Defendant.*

The defendant, convicted by a jury of drug and firearm offenses, has moved for judgment of acquittal as to two of the counts. For the reasons stated in this opinion, I will grant the motion as to Count Six and deny the motion as to Count One.

I

Larry A. Clyburn, the defendant, was charged in Count Six of a superseding indictment with possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C.A. § 924(c) (West 2000). At the conclusion of the government's evidence at trial, the defendant moved for judgment of acquittal as to Count Six. I reserved decision on the motion pursuant to Federal Rule of Criminal

Procedure 29(b). Thereafter, the jury convicted the defendant of the count, thus requiring that I now decide the motion based on the evidence at the time the ruling was reserved. *See* Fed. R. Crim. P. 29(b).

Clyburn was charged in Count One of the indictment with conspiring to manufacture fifty grams or more of a substance containing a detectable amount of methamphetamine in violation of 21 U.S.C.A. § 846 (West 1999). The jury also convicted the defendant of that count.[1] Clyburn thereafter filed a timely motion for judgment of acquittal as to Count One pursuant to Federal Rule of Criminal Procedure 29(c).

The defendant has briefed the motions and they are ripe for decision.[2]

II

The government's case at trial showed the following facts.[3]

---

[1] The jury also convicted Clyburn of manufacturing methamphetamine (Count Two); possession of pseudoephedrine with intent to manufacture methamphetamine (Count Three); maintaining a place for the purpose of manufacturing methamphetamine (Count Four); endangering human life while manufacturing methamphetamine (Count Five); and possession of a firearm by an unlawful user of a controlled substance (Count Seven).

[2] The government was also given an opportunity to file a brief.

[3] Since I did not reserve decision under Fed. R. Crim. P. 29(b) as to Count One, I may decide the post verdict motion for judgment of acquittal as to this count based on all the evidence. However, that makes no difference in my resolution of the motion.

-2-

Clyburn's home in a rural area of Grayson County, Virginia, was searched by law enforcement officers on August 11, 2003. The defendant was found in his back bedroom in bed with a woman. The search revealed a blue canvas bag on the floor of the closet in the bedroom containing material used in the manufacture of methamphetamine. Other such items were found in other areas of the home, but the greatest concentration of items was found in the bedroom and the nearby bathroom. Officers also found a Mossberg 20-gauge shotgun in the back bedroom behind the bedroom door. It was the only firearm recovered in the home. The gun was loaded with six shells, containing size seven and one-half pellets, which are used for rabbit and bird hunting. The shotgun did not have a plug. Under state law, one cannot hunt with a shotgun loaded with more than three shells, and the plug is required to prevent a shotgun from having more than three shells. It is not unusual to see a shotgun with the plug removed and it is not illegal to have a shotgun with the plug removed unless one is hunting. The shotgun was later test fired and found to be operable. The shotgun was admitted into evidence.

Upon being arrested, the defendant told Brian Snedeker, a special agent of the Drug Enforcement Administration, that he had been manufacturing methamphetamine for six months, and that he had learned to cook methamphetamine from an individual named George Harper. The defendant also admitted that he had been manufacturing

methamphetamine every one or two weeks during this six- month time period, and that he had used 200 thirty-milligram pseudoephedrine pills to make his methamphetamine.

Later, on June 2, 2004, officers again visited Clyburn at his residence and he admitted that he had manufactured methamphetamine five or six additional times since August of 2003. They also found more items for the manufacture of methamphetamine and Clyburn told them that he had burned himself in January of 2004 while making methamphetamine at his home. Clyburn admitted to Snedeker that some of these manufacturing activities had taken place at the Lovell residence, and that Mr. and Mrs. Lovell had helped Clyburn in the production of the methamphetamine.[4] Snedeker testified that he had seized several items from the Lovell residence related to the manufacture of methamphetamine.

Snedeker also testified that the yield of a typical methamphetamine cook was sixty percent. To put it another way, Snedeker stated that sixty percent of the cold medicine (pseudoephedrine) weight used in a cook would turn into methamphetamine.[5] Based on this figure and Clyburn's statement regarding how

---

[4] James and Joy Lovell are additional defendants in this case, with whom Clyburn was charged to have conspired.

[5] Snedeker stated that the national range is anywhere from sixty to seventy-five percent, and the range in southwest Virginia is between fifty-nine and seventy-eight percent.

-4-

much he had cooked during the six-month period, Snedeker estimated that Clyburn would have generated forty-six to ninety grams of methamphetamine.[6] Based on the cooks Clyburn told Snedeker about on August 11, 2003, and June 2, 2004, and using the lowest yield range, Snedeker stated that the least amount of methamphetamine Clyburn could have generated "would be around, over 50 grams, around 54, 55 grams." (Tr. 1-122.)

III

Clyburn's convictions must be sustained if, viewed in the light most favorable to the government, there is substantial evidence to support them. *See Glasser v. United States*, 315 U.S. 60, 80 (1942). In the context of a criminal action, the Fourth Circuit has defined substantial evidence as "that evidence which 'a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt.'" *United States v. Newsome*, 322 F.3d 328, 333 (4th Cir. 2003) (quoting *United States v. Burgos*, 94 F.3d 849, 862-63 (4th

---

Hence, he used the low end of the range, sixty percent, in calculating the methamphetamine yield from the drug cooks.

[6] Clyburn admitted that he had manufactured methamphetamine every one or two weeks during this six-month time period, and that he had used 200 thirty-milligram pseudoephedrine pills to make his methamphetamine. Based on this statement, Snedeker testified that Clyburn would have generated ninety grams if he cooked every week, forty-six grams if he cooked every two weeks, and sixty grams if he cooked every week and a half.

-5-

Cir. 1996) (en banc)). In evaluating the sufficiency of the evidence, the court does not review the credibility of the witnesses, but assumes that the jury resolved all contradictions in the testimony in favor of the government. *See United States v. Romer*, 148 F.3d 359, 364 (4th Cir. 1998).

A

The defendant was charged in Count Six of the indictment with having violated 18 U.S.C.A. § 924(c). That statute makes it a crime for any person, during and in relation to any drug trafficking crime, to "use[] or carr[y] a firearm, or . . . , in furtherance of any such crime, possess[] a firearm." 18 U.S.C.A. § 924(c).

A conviction under § 924(c) may be supported by a finding that a defendant used or carried a firearm in relation to a drug trafficking offense. *See United States v. Mitchell,* 104 F.3d 649, 652 (4th Cir.1997). The term "used" requires that the defendant have actively employed the firearm. *See Bailey v. United States,* 516 U.S. 137, 143 (1995).[7] Alternatively, the government may put forth evidence that possession of the firearm furthered a drug trafficking offense. *See United States v.*

---

[7] Although *Bailey* interpreted the term "used" to require active employment, it did not address the meaning of "carried." Thus, it follows that a firearm that has not been "used" may nonetheless have been "carried" and therefore sustain a conviction under § 924(c). Whether Clyburn "carried" a firearm is not an issue in this case.

-6-

*Ceballos-Torres,* 218 F.3d 409, 414 (5th Cir. 2000). Mere possession of a firearm is insufficient. *Id.*

There is no evidence that Clyburn "used or carried" a firearm. Because it is undisputed that Clyburn possessed a firearm, however, the issue is whether there was sufficient evidence from which the jury could conclude that he possessed the gun "in furtherance of" his drug trafficking activity. In determining this issue, "the statutory term 'furtherance' should be given its plain meaning." *United States v. Lomax,* 293 F.3d 701, 705 (4th Cir. 2002). In *Lomax*, the court defined "furtherance" as "'[t]he act of furthering, advancing, or helping forward.'" *Id.* (quoting *Webster's II New College Dictionary* 454 (1999)). Based on this definition, the court explained that "§ 924(c) requires the government to present evidence indicating that the possession of a firearm furthered, advanced, or helped forward a drug trafficking crime." *Id.*

The jury is free to consider the numerous ways that a firearm might further drug trafficking when making this factual determination. In *Lomax*, the court gave the following examples:

> [A] gun could provide a defense against someone trying to steal drugs or drug profits, or it might lessen the chance that a robbery would even be attempted. Additionally, a gun might enable a drug trafficker to ensure that he collects during a drug deal. And a gun could serve as protection in the event that a deal turns sour. Or it might prevent a transaction from turning sour in the first place. Furthermore, a firearm

-7-

could help a drug trafficker defend his turf by deterring others from operating in the same area.

*Id.* Similarly, the Fifth Circuit described the following factors that might lead a fact finder to conclude that a connection existed between a defendant's possession of a firearm and his drug trafficking activity: "the type of drug activity that is being conducted, accessibility of the firearm, the type of weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found." *Ceballos-Torres,* 218 F.3d at 414-15.

I find that under the facts of this case, even accepting the government's evidence as true, a reasonable jury could not find that Clyburn possessed the shotgun to further his drug crime. Although the firearm was loaded, it was a legally possessed shotgun.[8] While firearms are often the "tools of the drug trade," *see United States v. Ward*, 171 F.3d 188, 195 (4th Cir. 1999), there was no evidence that Clyburn was distributing the methamphetamine he manufactured, or that he had any reason to

---

[8] The government presented evidence that the shotgun was found without a plug. Under Virginia law, if hunting game with a shotgun, the magazine of the gun must be plugged to reduce the capacity of the gun to no more than three shells at one time in the magazine and the chamber combined. *See* Va. Code Ann. § 29.1-519(A)(2) (Michie 2004). In any event, Glenn D. Hyatt, Chief Investigator of the Grayson County Sheriff's Department, testified that it is not unusual to see a shotgun with the plug removed and it is not illegal to have a shotgun with the plug removed unless one is hunting.

-8-

protect the manufacturing site with a firearm. A reasonable jury would know that in this rural jurisdiction located in the Southern Appalachians, many, if not most, households contain shotguns and rifles. Many residents keep shotguns and rifles to protect their livestock or garden from animals, or to satisfy a desire for personal safety, or simply as part of their culture.

As explained in *Ceballos-Torres*, it is not the rule that "anytime a drug dealer possesses a gun, that possession is in furtherance, because drug dealers generally use guns to protect themselves and their drugs." *Ceballos-Torres,* 218 F.3d at 414. Rather than "mere presence," "[w]hat is instead required is evidence more specific to the particular defendant, showing that his or her possession actually furthered the drug trafficking offense." *Id.* Because the government did not meet its requirement of presenting evidence "indicating that the possession of a firearm furthered, advanced, or helped forward a drug trafficking crime," *Lomax,* 293 F.3d at 705, I will grant the defendant's motion for judgment of acquittal as to Count Six.

B

Count One charged the defendant with violating 21 U.S.C.A. § 846 (West 1999). Section 846 provides that "[a]ny person who . . . conspires to commit any offense . . . shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the . . . conspiracy." 21 U.S.C.A. § 846.

-9-

The defendant was convicted of conspiring to violate 21 U.S.C.A. § 841(a)(1) (West 1999), which makes it a crime to manufacture methamphetamine. The defendant concedes that a conspiracy was proven, but argues that there was insufficient evidence to support the jury's conclusion that he conspired to manufacture fifty grams or more of methamphetamine.

The Fourth Circuit has stated that "a conspiracy is clandestine and covert, thereby frequently resulting in little direct evidence of such an agreement." *United States v. Burgos*, 94 F.3d at 857. Indeed, proof of a conspiracy may be based solely on circumstantial evidence, which "may consist of a defendant's relationship with other members of the conspiracy, the length of this association, [the defendant's] attitude [and] conduct, and the nature of the conspiracy.'" *Id.* at 858 (quoting *United States v. Collazo*, 732 F.2d 1200, 1205 (4th Cir. 1984)). Moreover, "'[o]nce it has been shown that a conspiracy exists, the evidence need only establish a slight connection between the defendant and the conspiracy to support conviction.'" *Burgos*, 94 F.3d at 861 (quoting *United States v. Brooks,* 957 F.2d 1138, 1147 (4th Cir. 1992)).

As the jury could reasonably conclude that Clyburn conspired to manufacture methamphetamine, it also could reasonably conclude that he conspired to manufacture fifty grams or more of methamphetamine. It is immaterial that no direct

evidence was presented of an express agreement regarding the amount of methamphetamine to be manufactured since "the requisite agreement to act in concert need not result in any such formal structure, indeed frequently, in contemporary drug conspiracies, [the result is] a loosely-knit association of members linked only by their mutual interest in sustaining the overall enterprise of catering to the ultimate demands of a particular drug consumption market." *United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993). As stated by the Supreme Court in another context, "[o]ften crimes are a matter of inference deduced from the acts of the person accused and done in pursuance of a criminal purpose." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946).

In the present case, the jury was justified in its inference that a conspiracy existed to manufacture fifty grams or more of methamphetamine. Upon being arrested, Clyburn told Special Agent Snedeker that he had been manufacturing methamphetamine for six months, and that he had learned to cook methamphetamine from an individual named George Harper. Clyburn continued to manufacture methamphetamine after his arrest in August 2003, and admitted to Snedeker that some of these manufacturing activities had taken place at the Lovell residence, and that Mr. and Mrs. Lovell had helped Clyburn in the production of the methamphetamine. Snedeker testified that based on the cooks Clyburn told Snedeker

-11-

about on August 11, 2003, and June 2, 2004, and using the lowest methamphetamine yield range, the least amount of methamphetamine that Clyburn could have generated would be over fifty grams.

Because of the evidence that Clyburn was connected to at least three individuals who aided in his methamphetamine manufacturing, the evidence that Clyburn produced at least fifty grams of methamphetamine, and the evidence that all manufacturing activity occurred within a time frame of less than eighteen months, I cannot say that the jury was unreasonable in concluding that the defendant was guilty beyond a reasonable doubt of conspiring to manufacture fifty or more grams of methamphetamine.

IV

For the reasons stated, it is **ORDERED** that the defendant's Motion for Judgment of Acquittal is granted as to Count Six and denied as to Count One.

ENTER: May 3, 2005

/s/ JAMES P. JONES
Chief United States District Judge